UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:  Case No. 10-76271

GREG WILLIAM ROWE,  Chapter 7

        Debtor.  Judge Thomas J. Tucker
_____/

JAMES O. HULETT, etc.,

        Plaintiff,

v.  Adv. Pro. No. 11-4924

GREG WILLIAM ROWE,

        Defendant.
_____/

**TRIAL OPINION**

**I. Introduction**

    In this adversary proceeding, Plaintiff James O. Hulett, individually and as assignee of Professional Lawn Care, Inc., a dissolved Michigan corporation, seeks a judgment against Defendant Greg William Rowe for $276,466.68, plus interest and costs, and seeks a determination that this debt is nondischargeable in Rowe's Chapter 7 bankruptcy case, under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). The Court held a bench trial, then took this adversary proceeding under advisement. The Court has considered all of the arguments and evidence presented by the parties at trial. This opinion states the Court's findings of fact and conclusions of law.

    For the reasons stated in this opinion, the Court finds for Defendant Rowe, and will enter a judgment in his favor.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## III. Background and facts

Many of the facts in this case are undisputed. To begin with, the Court finds the following facts, which the parties stipulated to in the Final Pretrial Order:[1]

> 1. On March 12, 2000, Plaintiff, James O. Hulett ("Hulett"), as seller, and Greg Rowe, as purchaser, entered into a Stock Purchase/Option Agreement (the "Agreement") whereby Rowe agreed to purchase 49.9% of the outstanding capital stock of Professional Lawn Care, Inc., a Michigan corporation ("PLC") from Hulett for $200,000.00.
>
> 2. The Agreement further granted Rowe the option to purchase from Hulett the remaining 50.1% of PLC's capital stock for $1.00 after paying the initial purchase price.
>
> 3. Rowe paid Hulett $20,000.00 down at closing and executed a Promissory Note in the principal amount of $180,000.00 plus interest accruing on the unpaid balance at the rate of 10.25% per annum payable over 8 years.
>
> 4. On March 12, 2000, Rowe signed an Employment Agreement to act as PLC's President and manage PLC's lawn fertilizing operations.
>
> 5. On March 12, 2000, Rowe further executed a lease as President of PLC for PLC to operate its lawn fertilization business at PLC's then present location at 21600 Pennsylvania, Taylor, MI (the "Business Premises") for a base period of 5 years.
>
> 6. As of March 12, 2000, PLC operated a lawn fertilizer/

---

[1] These stipulated facts, numbered 1-21, are quoted from the Final Pretrial Order (Docket # 28), at 2-4.

chemical application business in the Detroit downriver area with at least 1,548 customers.

7. As of March 12, 2000 Rowe operated a one-man lawn fertilizing company operating out of his home in Melvindale, MI.

8. Starting in the spring of 2000, Rowe began servicing PLC's customers from the Business Premises.

9. On March 16, 2000 Rowe filed a Certificate of Assumed Name in Wayne County, MI under the name "Rowe's Professional Lawn Care."

10. Rowe's purpose for filing the Assumed Name Certificate of "Rowe's Professional Lawn Care" was to allow Rowe to deposit PLC's customers' checks payable to "Professional Lawn Care" into Rowe's personal bank account, not PLC's bank account.

11. Rowe's stated purported purpose for . . . filing said Certificate of Assumed Name was to avoid IRS levies against PLC's bank account.

12. Rowe and/or his corporation, Rowe's Greenview Lawn Care, Inc., a Michigan corporation (the "Corporation), have since March 12, 2000 collected and deposited all PLC's customers' checks into Rowe's bank accounts.

13. Only Rowe and his spouse, Shannon Rowe, had access to said "Greenview Lawn Care" bank accounts.

14. After March 12, 2000, Rowe used PLC's assets including (i) PLC's customer list; (ii) a 1995 F350 Stake truck; (iii) a 1996 F250 pick-up truck; (iv) a 1986 F150 pick-up truck; to service PLC's customers through Rowe's business.

15. After March 12, 2000, Rowe hired 3 of PLC's former employees.

16. In October 2000, Rowe abandoned the Business Premises and retained possession of PLC's customer list and motor vehicles.

17. On November 11, 2001, Rowe and his wife, Shannon Rowe incorporated the Corporation.

3

18. Rowe and his wife were the sole directors, officers and equal 50% shareholders of the Corporation.

19 The Corporation has disclosed the following gross receipts in its U.S. Income tax Returns since the year 2003:

| Tax Year | Gross Receipts |
|---|---|
| 2003 | $259,532 |
| 2004 | $234,035 |
| 2005 | $261,885 |
| 2006 | $251,219 |
| 2007 | $203,973 |
| 2008 | $240,768 |
| 2009 | $215,321 |

20. In 2009, Hulett sued Rowe in the Wayne County Circuit Court, bearing case no 2009-006462-CK for, inter alia, breach of the promissory note; common law conversion; statutory conversion; unjust enrichment; and civil conspiracy (the "Lawsuit").

21. On August 27, 2010 Judgment in the amount $302,725.87 was entered in favor of Hulett and against Rowe. However, the issue of conversion was not determined in the Lawsuit.

On December 1, 2010, Rowe filed a voluntary bankruptcy petition under Chapter 7. Rowe was granted a discharge in the Chapter 7 case, on March 8, 2011. Hulett filed this adversary proceeding on March 4, 2011.

In addition to stipulating to the facts quoted above, Hulett and Rowe stipulated in the Final Pretrial Order that "Hulett's damages are $276,466.68 plus costs, interest and attorney's fees incurred in this adversary proceeding."[2] At trial, during closing arguments, Hulett's counsel stated that Hulett was waiving the portion of his claims that sought attorney fees.[3]

---

[2] Final Pretrial Order (Docket # 28) at 5, 10.

[3] Trial Transcript (Docket # 43)(cited in this opinion below as "Tr.") at 153-54.

The next sections of this opinion discusses additional facts and evidence.

## IV. Discussion

Plaintiff Hulett has alleged four theories of nondischargeability under § 523(a) of the Bankruptcy Code. The Court will discuss these below.

### A. Count I of the First Amended Complaint — fraud under 11 U.S.C. § 523(a)(2)(A)

#### 1. Plaintiff Hulett's promissory fraud claims against Rowe

In Count I of Hulett's First Amended Complaint, he alleges that Rowe fraudulently induced Hulett into entering into the Stock Purchase/Option Agreement (referred to in this opinion below as the "Purchase Agreement") on March 12, 2000. In the Purchase Agreement, Rowe agreed to purchase from Hulett a total of 499 shares of PLC, which represented 49% of the PLC stock. Rowe paid $20,000.00 to Hulett at the signing of the Purchase Agreement, in exchange for 49 of the total of 499 shares that Rowe was purchasing. In the Purchase Agreement, and in the related Promissory Note that Rowe executed in favor of Hulett, also on March 12, 2000,[4] Rowe promised to pay the unpaid remainder of the purchase price for the stock, in the amount of $180,000.00, over a period of 8 years, plus interest at 10.25% per annum. Rowe was to make monthly payments to Hulett for 8 years in the amount of $2,755.22 per month, beginning on April 1, 2000.[5]

The evidence is undisputed that Rowe eventually defaulted on his monthly payment obligation to Hulett. Rowe made the required monthly payment of $2,755.22 per month for the

---

[4] Plaintiff's Exhibits 1 and 2. (In this opinion, Plaintiff's trial exhibits will be cited as "PX-_.")

[5] PX-1 at 1-2; PX-2.

months of April 2000 through June 2001 — a period of 15 months — but then stopped making the required payments.[6] After that, Rowe made only a few more, sporadic payments. According to Rowe's records, the payments he made after June 2001 were as follows:

| | |
|---|---|
| April 2004 | $5,000.00 |
| May 2004 | $1,000.00 |
| June 2004 | $1,000.00 |
| April 2006 | $1,500.00 |
| May 2006 | $1,500.00[7] |

Hulett's records show the above payments, plus two more payments not shown on Rowe's records:

| | |
|---|---|
| June 2002 | $6,156.00 |
| September 2003 | $8,000.00[8] |

In Count I,[9] Hulett alleges that Rowe fraudulently misrepresented that he would fully perform his obligation to make the monthly payments, when he made the Purchase Agreement and signed the Promissory Note on March 12, 2000. Hulett also alleges that Rowe fraudulently misrepresented that he would abide by the Employment Agreement that he made, also on March 12, 2000. In that agreement, Rowe agreed to "devote his best efforts on a full time basis as President of [PLC] to manage the daily operations of [PLC], and to develop and market the products and services of [PLC]."[10] Hulett further alleges that Rowe fraudulently misrepresented, in the March 12, 2000 Lease Agreement that Rowe executed as President of PLC, that PLC

---

[6] *See* PX-9; PX-21, last page.

[7] *See* PX-21, last page.

[8] *See* PX-9.

[9] First Amended Complaint (Docket # 16) at 5-7, including ¶ 16.

[10] *See* Employment Agreement, PX-3, at 1 ¶ 3.

would rent the premises owned by Hulett and operate PLC out of those premises for the full term of the Lease.[11]

Hulett's fraud allegations assert what is sometimes called promissory fraud — essentially, that someone has promised something with no intention of keeping that promise. *See, e.g., Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998)(the use of a credit card is a representation of an intention to repay the debt incurred; such use of a credit card while having no such intention can be a form of fraud under § 523(a)(2)(A)). Hulett's theory is that Rowe induced Hulett to extend Rowe credit under the Purchase Agreement and Promissory Note, and allow Rowe to pay the $180,000.00 over time, by making the contractual promises described above, with no intention of keeping them. And, Hulett claims, Hulett was induced by Rowe to give Rowe control over the management and property of PLC, under the Purchase Agreement and the Employment Agreement, by Rowe's contractual promises described above, but that when Rowe made those promises, on March 12, 2000, Rowe did not intend to keep them.

Rather, Hulett claims, Rowe later did all of the following, and intended from the beginning, in March 2000, to do all of the following: (1) divert the assets of PLC, including its receipts, customer list, customers, and equipment, to Rowe's personal benefit, and to the detriment of PLC and Hulett; and (2) eventually stop making his monthly payments to Hulett under the Promissory Note.

Hulett alleges another form of promissory fraud on the part of Rowe as well. Hulett claims that after Rowe defaulted by failing to continue making his monthly payments under the

---

[11] Lease, PX-4.

Promissory Note, Rowe fraudulently misrepresented that he would catch up and continue to make the payments under the Note. Rowe had no intention to keep those promises when he made them, according to Hulett, and those promises allegedly induced Hulett to forbear from taking action to enforce his rights under the contracts between the parties.[12]

Rowe denies that he committed any fraud.

**2. The elements of Hulett's § 523(a)(2)(A) nondischargeability claim(s)**

Section 523(a)(2)(A) excepts from discharge:

> any debt -
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

Exceptions to discharge, including the exceptions under § 523(a)(2), "are to be strictly construed against the creditor." *Rembert*, 141 F.3d at 281 (citing *Manufacturer's Hanover Trust v. Ward* (*In re Ward*), 857 F.2d 1082, 1083 (6th Cir. 1988)). The creditor must prove each of the elements under § 523(a)(2)(A) by a preponderance of the evidence. *Id*. (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

The Sixth Circuit has described the elements of nondischargeability under § 523(a)(2)(A) in this way:

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained

---

[12] *See* First Amended Complaint at ¶¶ 17-18.

8

> money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert,* 141 F.3d at 280-81 (citation omitted).

### 3. Whether Hulett has met his burden of proof

The Court finds and concludes that Plaintiff Hulett has not met his burden of proving his § 523(a)(2)(A) fraud theories, because he has failed to prove all the necessary elements.

First, Plaintiff Hulett has not met his burden of proving that Rowe intended or planned not to keep his contractual promises when Rowe and Hulett entered into the Purchase Agreement, Promissory Note, and other agreements on March 12, 2000. Phrased in terms of the *Rembert* fraud elements quoted above, Hulett has not met his burden of proving that Rowe knew when he made his contractual promises in March 2000 that he would not keep them; or that Rowe made his contractual promises in March 2000 with gross recklessness as to whether he would keep them. Nor has Hulett met his burden of proving that Rowe intended to deceive Hulett when Rowe made his contractual promises in March 2000.

If anything, the preponderance of the evidence tends to negate these elements of Hulett's fraud claims. Such evidence includes the following. First, Rowe made every monthly payment due to Hulett under the Purchase Agreement and Promissory Note for the first 15 months after Rowe made his contractual promises in March 2000. Those payments by Rowe totaled $41,328.30 ($2,755.22 x 15). And then, according to Hulett's records, Rowe made another seven payments to Hulett in 2004 and 2006, totaling $24,156.00.

Second, the Court credits the testimony of Rowe, who testified that he stopped making

9

the monthly payments to Hulett for reasons that do not raise an inference of fraudulent intent. These include Rowe's belief (whether right or wrong) that Hulett had breached the Purchase Agreement by failing to timely deliver certain stock certificates to Rowe in April 2001. More importantly, Rowe's reason for not continuing to pay was at least in part because Rowe could not afford to continue making the payments.[13] Rowe's testimony on this point is supported by the federal income tax returns for Rowe's company, Greenview Lawn Care, Inc., also known as Rowe's Greenview Lawn Care, Inc., for the years 2003 through 2009.[14] This is the company into whose bank account Rowe deposited all of PLC's receipts after March 12, 2000, and it is the company that was Rowe's source of income during these years. These tax returns support Rowe's testimony that he could not afford to continue making the required monthly payments to Hulett. This explanation for stopping the payments, after making them for the first 15 months, negates Hulett's claim that Rowe fraudulently intended from the beginning not to make all the payments.

Third, the Court does not draw an inference of fraudulent intent from the fact that very shortly after making the March 12, 2000 contracts, Rowe began causing all receipts of PLC to be deposited into the bank account of Rowe's Greenview Lawn Care, Inc., rather than using PLC's bank account. This is so for two reasons. First, Rowe has satisfactorily explained his taking this action, as an attempt to insure that PLC's receipts would not be seized by the Internal Revenue Service or by other creditors of Hulett. The Court credits Rowe's testimony on this point, including his testimony that he was warned by another, long-time employee of PLC, Diane

---

[13] Tr. 41, 42; 71-73 ;74-76; 78 (Rowe).

[14] PX-14 through PX-20; see also Tr. 74-75 (Rowe).

10

Duford, shortly after March 12, 2000 not to put money into PLC's bank account, because it might be frozen or seized by the Internal Revenue Service,[15] and including Rowe's testimony that in the Summer of 2000, an apparent creditor of Hulett's had tried to repossess some of Rowe's equipment, and the Internal Revenue Service in fact seized a piece of Hulett's equipment, a sweeper, although Hulett was able to get that returned by the IRS quickly.[16]

There is a second reason why the Court does not draw an inference of fraudulent intent from Rowe's depositing PLC receipts into the Greenview Lawn Care account. That reason is such action by Rowe, without more, did not harm either PLC or Hulett. This is so because (1) in the Summer of 2000, Hulett arranged to no longer have access to PLC's bank account;[17] (2) at all times after Hulett and Rowe made their agreements in March 2000, Hulett was completely uninvolved in the management or operation of PLC; (3) as Hulett noticed and knew, Rowe made his monthly payments to Hulett under the Promissory Note from the Greenview Lawn Care account;[18] and (4) there was no evidence that PLC's receipts were not used by Rowe to pay PLC's expenses.

Fourth, the Court does not draw any inference of fraudulent intent by Rowe in March 2000, from the fact that in October 2000, Rowe decided to move the business operations of PLC out of the premises owned by Hulett, in apparent breach of the March 12, 2000 Lease. At that time, Hulett moved the PLC operation to his home, and took most of the PLC equipment with

---

[15] Tr. 31; 67-69 (Rowe).

[16] Tr. 65-67 (Rowe); Tr. 99-100 (Hulett).

[17] Tr. 108-09 (Hulett).

[18] Tr. 32 (Rowe); 110-11 (Hulett).

him for that purpose. There is simply no inference of fraudulent intent logically to be drawn from this. And Hulett has satisfactorily explained this action in any event, as based on Hulett's desire to avoid the risk of having any of his equipment or any of the PLC equipment seized by the Internal Revenue Service or other creditors of Hulett.

Thus, the Court finds and concludes that Plaintiff Hulett has failed to meet his burden of proving that Rowe committed promissory fraud with respect to the contractual promises/ representations Rowe made to Hulett in March 2000.

Nor has Hulett proven his additional fraud theory, namely his theory that after Rowe defaulted on his monthly payments under the Promissory Note, Rowe fraudulently misrepresented that he would catch up and continue to make the payments under the Note. There is an utter lack of proof to support this theory. Hulett has not proven that Rowe made any such specific promise or representation. Nor has he proven that Rowe made any such promise or representation knowing that it was false when he made it, or with any intent to deceive Hulett. And even if Hulett had proven all the other *Rembert* fraud elements to support this theory, he has not proven any specific actual forbearance by him in reliance on such alleged misrepresentations by Rowe; or what that specific forbearance was, or how that forbearance caused him any actual loss or damage; or how much that loss or damage was. Thus, this fraud theory fails for lack of proof.

    **B. Counts II and III of the First Amended Complaint — embezzlement and larceny under 11 U.S.C. § 523(a)(4) and conversion (willful and malicious injury) under 11 U.S.C. § 523(a)(6)**

Plaintiff Hulett's remaining claims of nondischargeability are discussed together here because they all fail for lack of proof, for at least one common reason. Hulett claims that Rowe

12

is guilty of embezzlement and/or larceny, with the meaning of 11 U.S.C. § 523(a)(4), and of conversion that amounts to a "willful and malicious injury" under 11 U.S.C. § 523(a)(6). These claims are all based on Rowe's actions in allegedly diverting the assets of PLC, including its receipts, customer list, customers, and equipment, away from PLC and to Rowe's personal benefit, to the detriment of PLC and Hulett.

There may be other reasons why these nondischargeability claims fail in this case, but one reason common to all of them is that Hulett has not met his burden of proving that he or PLC suffered any actual damage or loss from these alleged improper actions by Rowe, and more importantly, the dollar amount of any such damage or loss.

As stated in section II of this opinion, Hulett and Rowe stipulated in the Final Pretrial Order that "Hulett's damages are $276,466.68 plus costs, interest and attorney's fees incurred in this adversary proceeding."[19] This is the only stipulation of the parties about damages. (And as noted above, Hulett waived any claim for attorney fees, in closing argument at trial.) And from the evidence at trial, it is obvious where the $276,466.68 number comes from. That is the amount that Hulett's records show he was owed by Rowe, including interest, as of June 1, 2011, *under the Promissory Note*.[20] This, of course, is the unpaid amount of the purchase price for Rowe's purchase of the 499 shares of PLC stock under the Purchase Agreement.

Thus, the Court interprets the parties' stipulation to the $276,466.68 damages number as their agreement that *if* the debt owing from Rowe to Hulett *under the Promissory Note* (for the stock to be purchased under the Purchase Agreement) is found to be nondischargeable, then the

---

[19] Final Pretrial Order (Docket # 28) at 5, 10.

[20] *See* PX-9, last page.

amount of that debt is $276,466.68, plus interest from June 1, 2011 forward.

But the damages under Plaintiff Hulett's claims of larceny, embezzlement, and conversion, are not measured by the amount of debt still due under the Promissory Note for Rowe's purchase of the PLC stock. Rather, the damages for those claims is equal to the amount of actual loss suffered by Hulett and/or PLC (since Hulett claims to be PLC's assignee) because of Rowe's diversion of the PLC property described above. That, in turn, is measured by what the value of that PLC property was when it was allegedly converted/embezzled/taken by Rowe. That value may or may not be anything remotely close to the amount of debt still due under the Promissory Note (which includes several years of interest). That value is not tied to, or logically connected in any way to, the amount still owing under the Promissory Note.

Plaintiff Hulett has cited no legal authority to argue otherwise. And the parties' stipulation about the $276,466.68 damages amount is too vague to enable the Court to interpret it to refer to the damages for Rowe's alleged embezzlement, conversion, or larceny. This is especially so given that the evidence discussed above clearly shows that the $276,466.68 amount is calculated in a way that has nothing to do with the measure of damages for embezzlement, conversion, or larceny.

At trial, Hulett presented no evidence to show what the value was of any of the items or types of PLC property, when they were allegedly converted/embezzled/taken by Rowe (or at any other time). For examples: What was the value of any of the PLC trucks taken? What was the value of any of the other landscaping equipment taken? What was the amount of PLC receipts deposited into the bank account of Rowe's company, and how much of those diverted receipts were *not* used to pay the expenses of PLC? What was the value of PLC's customer list? At

14

trial, Hulett presented no evidence on these questions, and certainly did not prove the amount of damage or loss caused by Rowe's alleged diversion of these items of PLC's property. For this reason, Hulett has failed to meet his burden of proving at least one essential element of his nondischargeability claims under §§ 523(a)(4) and 523(a)(6). Because of this failure, the Court finds it unnecessary to discuss these claims further.

V. Conclusion

Based on the findings of fact, conclusions of law, and the reasons stated in this opinion, the Court will enter a judgment for Defendant Greg William Rowe, dismissing Plaintiff James O. Hulett's claims with prejudice.[21]

**Signed on September 7, 2012**                **/s/ Thomas J. Tucker**
                                               **Thomas J. Tucker**
                                               **United States Bankruptcy Judge**

---

[21] The Court concludes that 11 U.S.C. § 523(d) does not apply in this case, because the debt in question is not a "consumer debt" within the meaning of § 523(d).

15